**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Haley M., | No. 0:19-cv-01098-DSD-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | |

In this case, Haley M. (hereafter "Ms. M") appeals the Commissioner of Social Security's denial of her application for Supplemental Security Income ("SSI") benefits. The parties have filed cross-motions for summary judgment. [Pl.'s Mot., ECF 12; Def.'s Mot., ECF 14.] For the reasons set forth below, the Court recommends that the Commissioner's motion be granted and Ms. M's motion be denied.

I.    **Background**

Throughout her life, Ms. M has struggled with several mental impairments, including fetal alcohol syndrome ("FAS"), attention-deficit hyperactivity disorder ("ADHD"), anxiety disorder, and oppositional defiant disorder. [Admin. Record ("R") at 16, 262, ECF No. 11.] In November 2015, testing revealed a full-scale IQ score of 69, indicating that Ms. M has significant limitations in cognitive functioning. [R. 365.] Though she can engage in several aspects of self-care, Ms. M has occasionally reported injuring herself by cutting; needs reminders to take medication; can only infrequently prepare simple foods; continues to live with her family; does not contribute to housework; has never paid her own bills and has help with her savings account; and does not drive a vehicle. [R. 235-40.] Ms. M also experienced a number of

complications with her urological health, including a diagnosis of interstitial cystitis. [R. 397-444, 448-59, 468-605.]

When she was in high school, Ms. M attended special education courses and had an Individual Education Plan ("IEP"). Ms. M's first job was at a McDonald's, which she obtained through the school's special education program. Her special education case worker noted that Ms. M had difficulty during her school career acquiring and using information, attending and completing tasks, interacting with others (including responding to authority), and caring for herself. [R. 251-321.] Still, Ms. M graduated high school on an IEP in June 2015 and was not entered into any adult-transition program. Her IEP team noted that she had made significant progress during her senior year in controlling her behaviors, and testing indicated that she had the basic academic skills needed for successful employment. [R. 261-70, 317.]

### Procedural History

When she applied for benefits from the Social Security Administration in February 2016, Ms. M was not quite 19 years old. [R. 184-90.] The SSA denied her application initially and on reconsideration. [R. 83-114.] On August 22, 2016, she requested a hearing before an Administrative Law Judge ("ALJ"). [R. 131-33.] On May 15, 2018, ALJ Nicholas Gray held a hearing at which Ms. M appeared with counsel and testified. Wayne Onken, a vocational expert, also testified at the hearing. [R. 40-82.] The ALJ denied Ms. M's claim in a written decision, and the Appeals Council denied her request for further review. [R. 1-3 (Appeals Council decision), 10-35 (ALJ decision).] The ALJ's ruling the final decision of the Commissioner, and Ms. M filed this lawsuit. 42 U.S.C. § 405(g); [Compl., ECF No. 1.]

***The ALJ's Decision***

The ALJ denied Ms. M's application based on the five-step sequential evaluation process applicable to disability applications. "During this process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not, 5) whether the claimant can perform any other kind of work.'" *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir.2006), and citing 20 C.F.R. § 416.920).

At the first step, the ALJ found that Ms. M had not engaged in substantial gainful activity since she filed her application, but noted that she testified that she had recently begun working full-time hours between a job at McDonald's and a Super America convenience store. [R. 16.] The ALJ next found that Ms. M has the following severe impairments: learning disorder, fetal alcohol syndrome (FAS), attention deficit hyperactivity disorder (ADHD), mood disorder, and anxiety disorder. However, ALJ Gray determined that Ms. M's diagnosis of interstitial cystitis as not a severe impairment. [*Id.*]

At the third step, the ALJ found that Ms. M does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). Specifically, the ALJ considered Listing 12.05, which concerns intellectual disorders, and contains three criteria. Although Ms. M's full-scale IQ score below 70 satisfied one of the Listing's criteria, the ALJ found she did not have deficits in adaptive functioning of sufficient severity to meet or medically equal the second criteria. [R. 17-25.]

Next, the ALJ determined Ms. M's residual functional capacity (RFC), which represents the work-related activities she remains capable of performing, considering all of her impairments. The ALJ found that Ms. M has the RFC to perform a full range of work at all exertional levels, but with certain non-exertional limitations. Ms. M was found capable of doing "simple routine work, limited to brief and superficial contact with others on an occasional basis." [R. 25-33.] Based on this RFC, at the fourth step of the process the ALJ found that Ms. M was unable to perform her past relevant work as a fast food cashier. [R. 33.] Finally, the ALJ found that considering Ms. M's age, education, work experience, and RFC, she is not disabled because she is capable of performing other jobs that exist in significant numbers in the national economy. [R. 33-34.]

In reaching these conclusions, the ALJ considered opinion evidence from medical and nonmedical sources, and the weight given to those opinions is the primary issue in this appeal. Two state agency consultants reviewed Ms. M's application at the initial and reconsideration level and determined that she did not meet or medically equal Listing 12.05. They rated her adaptive functioning abilities to be higher than necessary to satisfy the severity of Listing 12.05(B). The ALJ gave their opinions great weight, although neither consultant had access to her school records at that time. By contrast, the ALJ gave only partial weight to the opinion of Ms. M's treating neurologist, Dr. Tajana Friday, who believed Ms. M would need to live in a supported environment and could not be her own decision-maker in financial and legal matters. Dr. Friday had reviewed neuropsychological testing performed by Dr. Maida Gunther, who also did not have access to Ms. M's school records. The ALJ noted this fact in the discussion of the partial weight he assigned to their opinions. In addition, the ALJ gave limited weight to an

opinion from Ms. M's special education teacher, Mikki Hanson, which indicated serious issues in several areas of adaptive functioning.

## II.      Legal Standard

Review of the Commissioner's denial of an application for disability benefits is limited and deferential, requiring a federal court to affirm if the decision is supported by "substantial evidence" on the record as a whole. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017); *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014). Substantial evidence is less than a preponderance; it is relevant evidence that a reasonable person would find adequate to support the ALJ's determination. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). A reviewing court must consider not only the evidence that supports the conclusion, but also that which detracts from it. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). However, the court does not reweigh the evidence and should not reverse the Commissioner's decision simply because substantial evidence might also support a different conclusion. *Reece v. Colvin*, 843 F.3d 904, 908 (8th Cir. 2016). So long as the Commissioner's decision does not fall outside of the "available zone of choice," it should be affirmed. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). In other words, where the Commissioner's decision is among the reasonable conclusions that can be drawn from the evidence in the record as a whole, it will not be disturbed. *See Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007); *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

## III.     Discussion

Ms. M argues that the ALJ erred in several respects, including weighing the opinion evidence in connection with the Listings evaluation, determining which of her impairments qualify as severe, and defining her residual functional capacity. Based on a thorough review of

the record as a whole and in light of the deferential standard of review applicable to Social Security appeals, the Court concludes that the Commissioner's decision should be affirmed.

### A.  Listing 12.05

Ms. M first argues that the ALJ erroneously determined that she does not meet or medically equal the criteria of Listing 12.05(B). To show that she is disabled based on this Listing, a Social Security claimant must satisfy three criteria. *Cronin v. Saul*, 945 F.3d 1062, (8th Cir. 2019). In relevant part, the claimant must have a mental disorder as shown by a full-scale IQ score of 70 or below. *Id.* (quoting Listing 12.05(B)(1)(a)). Second, the claimant must show significant "deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: a. Understand, remember or apply information[;] or b. Interact with others[;] or c. Concentrate, persist, or maintain pace[;] or d. Adapt or manage oneself[.] *Id.* (quoting Listing 12.05(B)(2)). And third, the claimant must show that the mental disorder began before she turned age 22. *Id.* (quoting Listing 12.05(B)(3)).[1]

The dispute in this case centers on the severity of Ms. M's deficits in adaptive functioning. Here, the ALJ determined that Ms. M does not meet Listing 12.05(B) because she does not have an extreme limitation in one, or marked limitation in two, of the areas of adaptive functioning. The ALJ determined that Ms. M has: (a) moderate limitation in understanding, remembering, or applying information; (b) moderate limitation in interacting with others;

---

[1] There is no dispute that Ms. M has a mental disorder, nor that she meets the first and third criteria of the Listing. The record supports a finding that she has full scale IQ scores of 70 or below, which were found by Dr. Maida Gunther during testing in November of 2015, shortly after Ms. M graduated from high school, and in February of 2014 by Licensed School Psychologist Linda McDermott. [R. 368-73 (Dr. Gunther's testing); R. 278 (LSP McDermott's testing).] Indeed, the ALJ agreed that Ms. M satisfied the criteria of the Listing related to her IQ. [R. 13 ("I agree that section 12.05B1a is satisfied based on the Full Scale I.Q. under 70 in 2014.").] There is also no dispute Ms. M's disorder began before she was 22 years old.

(c) moderate limitation in concentrating, persisting, or maintaining pace; and (d) mild limitation in adapting or managing herself. [R. 21-24.] For the reasons that follow, the Court finds that the ALJ's assessment of these issues is adequately supported by the record.

### 1. Medical Opinions

Ms. M's primary argument regarding the ALJ's adaptive-deficits findings is that the ALJ erred the weight he assigned to the opinions from the non-examining state agency consultants, her treating neurologist Dr. Friday, and her special education teacher Ms. Hanson. Ms. M argues that the ALJ erred in giving great weight to the state agency consultants' opinions that she has only moderate limitations in the various domains of adaptive functioning considered in Listing 12.05. She asserts that their opinions were entitled to little or no weight because the consultants did not review her school records, which were clearly relevant to this issue. And Ms. M argues that the ALJ's error was compounded by the fact that he discounted Dr. Friday's opinion because it was based in part on the conclusions of an examining source who did not review her school records. [Pl.'s Mem. at 13-14.]

Treating physicians' opinions may receive controlling weight if they are "well supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). However, a treating physician's opinion does not "automatically control" because an ALJ must evaluate the entire record. *Id.* The ALJ may discount a treating physician's opinion if "other medical assessments are supported by better or more thorough medical evidence…." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). It is also acceptable for an ALJ to discount a treating doctor's opinion that is" inconsistent with or contrary to the medical evidence as a whole…." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). Whether the ALJ gives a treating physician's

opinion great or little weight, the ALJ must give "good reasons" for doing so. *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

Non-examining sources' opinions generally, but not always, receive less weight than examining sources' opinions. *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008). An ALJ should take into account whether a non-examining source considered all of the relevant evidence and the degree to which the source supported the opinion with an explanation. 20 C.F.R. § 416.927(c)(3). An ALJ may assign greater weight to medical evaluations of non-treating sources than to the opinions of treating physicians when the other assessments are "supported by better or more thorough medical evidence." *Prosch*, 201 F.3d at 1014 (internal quotations and citations omitted).

Opinions from "nonmedical sources" are also considered in evaluating a disability claim. 20 C.F.R. § 416.927(f). Nonmedical sources include "educational personnel, such as school teachers…." SSR 06-03p, 71 F.R. 45593-06, 2006 WL 2263437 (Aug. 9, 2006). Information from other sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (quoting SSR 06-03p). The ALJ is required to consider evidence from other sources, but "the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record" *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (citing *Lacroix v. Barnhart*, 465 F.3d 885, 886-87 (8th Cir. 2006)

The Court agrees that an ALJ should not discount a treating or examining source's opinion based on a lack of access to relevant records while disregarding that same concern when giving greater weight to an opinion of a consulting source. However, this concern does not require remand to the Commissioner. Aside from the issue of access to records, the ALJ gave

other good reasons for assigning greater weight to the opinions of the consultants and for discounting the opinions offered by treating and examining sources, reasons that are adequately supported by the record as a whole.

### The Opinions at Issue

Several medical opinions are at issue in Ms. M's challenge to the ALJ's finding that she did not have sufficiently severe deficits in adaptive functioning. First, there are the two opinions from the state agency consultants. On April 1, 2016, in connection with the evaluation of Ms. M's claim at the initial level, Dr. Michael V. DeSanctis reviewed Ms. M's medical records and opined that she has mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.[2] [R. 89-90.] Dr. DeSanctis opined that Ms. M did not meet the Paragraph B criteria of Listing 12.05 based on review of medical records and other evidence concerning her functioning. [R. 90] He found that mental status examinations were unremarkable and noted that the IQ testing had large variations with the full scale IQ ultimately being pulled down by very low working memory and processing speed scores. [*Id.*] Dr. DeSanctis believed the weight of the evidence indicated a severe mental evidence that does not meet or equal the Listing. [*Id.*] However, he stated that there were "no school records to review." [*Id.*] On reconsideration, Dr. Mary Sullivan's second-level assessment of the medical evidence in the record was essentially identical to Dr. DeSanctis's initial opinion. [R. 105-06.] She also noted that there were "no school records to review." [R. 106.]

---

[2] These domains of adaptive functioning were contained in a previous version of the relevant regulations. The applicable Paragraph B criteria in this case are those identified above. However, Ms. M does not argue that the state agency consultants' opinions are entitled to less weight because of this discrepancy.

Second, there are the opinions of Dr. Friday, Ms. M's treating neurologist, and Dr. Gunther, the examining physician who found Ms. M's full-scale IQ to be 69 based on neuropsychological testing. Dr. Friday saw Ms. M in December 2015 at Noran Neurological Clinic for a follow-up concerning migraine-headache treatment and to discuss the November 2015 results of Dr. Gunther's testing. [R. 364-66.] Dr. Friday noted Ms. M's complaints regarding chronic headaches, struggles with depression and anxiety, concerns about poor decision-making, and repeated failures to obtain her driver's license. Dr. Friday found Dr. Gunther's testing results to be consistent with Ms. M's history of low intellectual functioning, having an IEP throughout school, and concerns over her decision-making ability. Dr. Friday diagnosed Ms. M with mixed-headache etiology, anxiety and depression with self-injurious behavior, and mild intellectual disability. She counseled Ms. M regarding responsible decision-making and recommended that she not pursue a driver's license based on her test results, the latter of which caused Ms. M to become upset and defiant. Dr. Friday noted that Ms. M would benefit greatly from individual and group therapy for her anxiety and depression, something she had not previously done. Finally, Dr. Friday opined that Ms. M would benefit from support to gain independence with paying bills, cooking, and similar issues. Dr. Friday recommended that if Ms. M lives independently, "it should be in a supervised living environment. It is not felt that she has the ability to be her own decision maker, in particular with health care, finances and legal situations." [*Id.*]

Dr. Gunther administered an array of tests, which revealed extremely low working memory, processing speed, and the full-scale IQ of 69. [R. 370.] Dr. Gunther discouraged Ms. M from obtaining a driver's license. [R. 372.] Dr. Gunther recommended that Ms. M become involved in individual and group therapy and noted that her challenges comprehending complex

10

language favored keeping information simple and concrete. [*Id.*] She also recommended that Ms. M should have a supervised living environment because she did not feel Ms. M was able to be her own decision-maker for health care, finances, and legal situations. [R. 372-73.] Finally, Dr. Gunther recommended that Ms. M would benefit from county support such as an ARMHS worker and any other available services to support living and employment. "If she were to live independently," Dr. Gunther wrote, "it would be recommended she reside in an environment which would allow for support as needed, for example, an independent apartment in a supervised living environment." [R. 373.]

*Analysis*

The Court finds that the ALJ did not err in assigning partial weight to Dr. Friday's opinion and assigning great weight to the opinions of the state agency consultants. The most troubling aspect of the ALJ's analysis is the apparent finding that Dr. Gunther's lack of access to school records was a basis for giving less than full weight to her opinion while simultaneously disregarding the non-examining consultants' lack of access to those same records. This suggests the ALJ may have given more exacting scrutiny to the treating and examining source opinions than he did to the non-examining consultants. *See Malone v. Comm'r of Soc. Sec.*, Case No. 1:16-cv-1004, 2017 WL 8676559, at *9 (S.D. Ohio Dec. 12, 2017) (noting Sixth Circuit precedent expressing concern "where the ALJ appeared to give greater scrutiny to the treating source opinion than to the opinions of the non-examining consulting psychologists."). Were this the only reason the ALJ gave for assigning different weight to these two sets of opinions, the Court would recommend remand to the Agency for further proceedings free of such an error.

However, the ALJ provided other good reasons for giving great weight to the state agency consultants' opinions and only partial weight to the opinions from Dr. Friday and

Dr. Gunther, and these reasons are supported by the record. With respect to the non-examining consultants, the ALJ conducted an independent and thorough review of the entire record, including the school records that Ms. M points to in support of her claim. [R. 17-19 (discussing Ms. M's school records in detail).] "The fact that a state agency medical consultant did not have access to all of the records does not prevent the ALJ from assigning significant weight to the consultant's assessment if the ALJ conducted an independent review of the evidence, which included notes the consultant had not considered." *Perry v. Colvin*, No. CIV. 13-1185 JNE/TNL, 2014 WL 4113015, at *58 (D. Minn. Aug. 20, 2014) (quoting *Vue v. Colvin*, No. 13–cv–357 (ADM/FLN), 2014 WL 754873, at *9 (D. Minn. Feb. 26, 2014) (quotation omitted); *accord Thacker v. Astrue*, No. 3:11CV246–GCM–DSC, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011). The ALJ did not err as a matter of law in giving great weight to the consultants merely because they appeared not to have reviewed the school records.

Moreover, the ALJ did not discount Dr. Friday's or Dr. Gunther's opinions simply because Dr. Gunther had lacked access to the school records. The ALJ gave Dr. Friday's opinion partial weight and discussed it in concert with Dr. Gunther's examining opinion, finding several aspects of the opinions supported by the overall record and other recommendations to be inconsistent with it. The ALJ found support for the conclusions that Ms. M's test results reflected her history of academic achievement and the recommendation that Ms. M would benefit from mental-health treatment. The ALJ also found the conclusions that Ms. M should not drive to be well supported. [R. 29.] However, the ALJ determined that the "concerns about the claimant's ability to engage in decision-making are only partially consistent with the record as a whole…." The ALJ found that the "larger record supports [Ms. M's] ability to make simple decisions but not more complex or long-term decisions such as financial planning and legal situations, and

some lack of insight into her own mental health condition." The ALJ also contrasted Ms. M's "high level of independence in most activities of daily living" with the recommendations for support and county services in connection with independent living. [R. 29.]

These reasons for discounting their opinions are supported by substantial evidence. Significant information in the record showed that Ms. M was functioning at a higher level than reflected in the more restrictive portions of Dr. Friday's and Dr. Gunther's opinions. Though some of her earlier school records showed very problematic behaviors and profound difficulties interacting with others, Ms. M's final IEP noted that she had made significant improvement in this area, including socializing with friends. Her mother observed increased maturity at home and at school, and she believed Ms. M would be successful with employment and independent living after high school. The IEP team determined that Ms. M did not demonstrate needs in the area for independent living, and she was not placed in additional school-based transition programming after graduation. She was managing a savings account and handling all the bills associated with her dog. She could complete job applications and was encouraged to continue exploring employment opportunities and training programs. [R. 261-62.] By the time of the hearing, she was working 40 hours per week between two jobs. [R. 54.] Between her graduation in June 2015 and the May 2018 hearing, Ms. M had very conservative mental health treatment and had not been attending individual or group therapy. Her mental status examinations with her treating psychiatrist were largely unremarkable. [R. 381-94, 460-67, 606-17.] There was also evidence supporting the ALJ's observations that Ms. M engaged in activities of daily living with a fair degree of independence, including caring for fish and a dog, engaging in almost all areas of self-care without support, and preparing simple meals. [R. 24, 29, 235-50, 316, 381-82.] The evidence of Ms. M's significant work history after she graduated high school also supports the

ALJ's conclusions that the more restrictive aspects of the treating and examining opinions warranted only partial weight. [*See* R. 606-17 (mental health records discussing employment with psychiatrist from Sep. 2016 through Feb. 2018).] These same facts support the ALJ's assessment that the opinions of the state agency consultants were consistent with the overall record.

Overall, the Court finds that the ALJ's determination of the weight assigned to the medical opinions is supported by substantial evidence on the record as a whole. The ALJ gave good reasons for partially discounting Dr. Friday's and Dr. Gunther's more restrictive opinions regarding Ms. M's ability to function based on partial inconsistencies with the record. The reference to Dr. Gunther's lack of access to school records did not cause the ALJ to improperly discount her examining source opinions because the other reasons provided were adequately supported by the evidence. Accordingly, the Court will not recommend remand to the Agency based on this issue.

### 2.  Mikki Hanson's Opinion

Ms. M also discusses the opinion offered by her Special Education Case Manager, Mikki Hanson. However, Ms. M does not make a specific argument regarding the ALJ's handling of Ms. Hanson's opinion. Rather than treat this issue as waived, as the Commissioner suggests, the Court has reviewed the ALJ's assessment of Ms. Hanson's opinion in light of the overall record. To the extent Ms. M suggests that the ALJ erred in evaluating Ms. Hanson's opinion, the Court concludes that the ALJ provided good reasons for declining to give it greater weight.

Ms. Hanson found that Ms. M had "serious" and "very serious" problems in several areas of adaptive functioning, including acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself. [R. 252-56.] The ALJ gave

Ms. Hanson's opinion limited weight. The ALJ reasoned that Ms. Hanson's ratings of Ms. M's functioning were "generally consistent" with evidence of behavioral issues in the classroom from earlier in her high school career, but inconsistent "with the records showing significant improvement by her senior year." [R. 31; R. 18 (contrasting Ms. Hanson's opinion with the final IEP reports).] The ALJ also gave greater weight to the more recent school reports that showed "improvement in behavior, self-control, and engagement…." [R. 31; R. 18.]

The school records from Ms. M's senior year and her final IEP report contain substantial evidence supporting the ALJ's findings. Ms. M's behavioral improvement was noted by her IEP team. Her mother and the IEP team also believed she did not need continued services through a transitions program. She was considered capable of living independently, and it was believed she should pursue employment opportunities after graduation. Ms. M does not explain why it was error for the ALJ to rely on such evidence in evaluating Ms. Hanson's opinion. Those inconsistencies were a proper basis for the ALJ to discount Ms. Hanson's assessment. *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) ("In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.") (citation omitted). Moreover, Ms. Hanson offered her opinion more than two years before the ALJ's decision, and Ms. M does not point to any evidence in the intervening years that showed regression in her behavior, self-care, or engagement outside the significant support system available to her during her schooling.

For these reasons, the Court finds no error in the ALJ's evaluation of Ms. Hanson's opinion.

### 3. Substantial Evidence

Ms. M asserts that the ALJ should have found that she has at least marked restrictions in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing herself, though it is not clear whether Ms. M raises a separate argument on this point. [Pl.'s Mem. at 10-11.] Nevertheless, to the extent Ms. M claims that the ALJ's findings of only moderate or mild restrictions in these areas is not supported by substantial evidence, the Court disagrees.

Ms. M identifies evidence in the record reflecting significant issues she has experienced in the relevant adaptive-functioning domains. For example, she cites Dr. Gunther's test results and recommendations, Dr. Friday's assessment, and Ms. Hanson's evaluations. Ms. M also points to IEP records that demonstrate her struggles controlling her behavior while in high school and the alternative coursework she completed to be able to graduate. [R. 264-67.] She highlights her testimony that she repeatedly failed driving tests and that she received a waiver through her home county's Community Access for Disability Inclusion ("CADI") program, which permitted her to obtain services due to her inability to drive. [R. 63-65, 354-56.]

There can be no doubt that this evidence provides support for Ms. M' disability claim. Because the record as a whole must be considered, the Court has taken this evidence into account in evaluating the ALJ's decision. *See Goff*, 421 F.3d at 790 (explaining that evidence that both "supports and detracts from the ALJ's decision should be considered"). However, the question before the Court is not simply whether it would have decided the case differently in the first instance or whether there is some evidence in the record that could support a contrary outcome. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). Instead, taking into account all of the evidence in the record, the Court must affirm if the ALJ's decision is among the reasonable

conclusions that can be reached. *Gregory v. Comm'r, Soc. Sec. Admin.*, 742 Fed. App'x 152, 154 (8th Cir. 2018) (per curiam) ("We will affirm the ALJ's findings if—when viewing the record as a whole—they are supported by substantial evidence, meaning evidence that is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.") (internal quotation marks omitted).

Here, the ALJ's findings regarding the severity of Ms. M's deficits in adaptive functioning satisfy the deferential standard of review. Some of the evidence Ms. M cites in support of her argument to the contrary was more than two years old at the time of the ALJ's May 15, 2018 decision. Dr. Friday's assessment was issued in December 2015, Dr. Gunther's testing occurred in November 2015, and Ms. Hanson's responses to the questionnaire were provided in April 2016. Based on the evidence in the record, the ALJ reasonably observed that subsequent evidence showed greater adaptive functioning and identified other record evidence that partially contradicted aspects of these assessments or recommendations.[3] Accordingly, the Court concludes that the ALJ's finding that Ms. M did not meet or medically equal the severity of Listing 12.05(B)'s adaptive deficitis criteria is sufficiently supported that remand to the Agency for further proceedings is not required.

---

[3] *See* R. 18 (discussing Ms. Hanson's opinion, noting improvement reflected in Ms. M's final IEP, and identifying evidence regarding her good track record in part-time employment); R. 19-20 (contrasting Dr. Gunther's testing results and recommendations with more recent intelligence testing results showing higher General Ability Index scores that were consistent with school records); R. 21-22 (discussing evidence reflecting independent self-care activities, showing that Ms. M bought her own clothes and paid for her own food, and indicating that she was working full time between two jobs); R. 22 (discussing evidence relevant to the issue of interacting with others); R. 23 (evaluating abilities to concentrate, persist, and maintain pace); R. 24 (assessing evidence of Ms. M's limitations in adapting or managing herself). Substantial evidence backs up the ALJ's analysis of these issues. [*See, e.g.*, R. 54, 68, 261-62. 266, 295-97, 316, 381-83, 460-61, 606-17.]

### B.  Interstitial Cystitis

Ms. M next asserts that the ALJ erred in concluding that her interstitial cystitis is not a severe impairment, which, in turn, undermines the ALJ's RFC assessment. She claims that the ALJ's RFC assessment failed to account for all of the limitations she would experience in a work setting. The Court finds no error in the ALJ's findings at step two regarding the list of severe impairments, nor in the failure of the RFC to include additional limitations based on Ms. M's cystitis diagnosis.

At step two of the sequential evaluation, the ALJ found that Ms. M has the following severe impairments: "learning disorder, fetal alcohol syndrome (FAS)/attention deficit hyperactivity disorder (ADHD), mood disorder, anxiety disorder." [R. 16.] He observed that the record "also shows a number of impairments that do not meet the criteria for a severe impairment because the record indicates they have not affected the claimant's ability to perform work-related activities more than minimally for a period of 12 months or more or been determined likely to do so." [*Id.*] Specifically, the ALJ addressed interstitial cystitis and chronic urethritis as among these impairments that failed to meet the severe-impairment threshold. The ALJ noted Ms. M's bladder-related issues were treated with medications. [*Id.*] The ALJ cited records from April, May, and August of 2016, including the findings following a cystoscopy procedure, which led to the diagnosis of "fairly severe" interstitial cystitis. [R. 16, 448-59, 468-72, 618-25.]

The threshold for an impairment to be "severe" is not an "onerous requirement," but it is also not "a toothless standard." *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007). For an impairment to be considered severe, it must meet a twelve-month durational requirement and significantly limit the claimant's physical or mental ability to do basic work activities. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006) (durational requirement); *Kirby*, 500 F.3d at 707

(significant limitation on basic work activities required). The claimant must establish that an impairment is severe. *Mittlestedy v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).

Although the evidence demonstrates a diagnosis of interstitial cystitis and that Ms. M sought treatment for issues with urinary frequency, bladder infections, and dysuria issues several times from April 2015 through mid-2016, the medical records do not support a sustained period of more than minimal work-related limitations. Several medical records cited by the ALJ demonstrate that Ms. M sought care for these conditions and that they were occasionally listed as part of her medical history when she visited her gynecologist with other concerns. However, these records also reflect a conservative course of treatment and do not indicate any significant limits on Ms. M's ability to do basic work activities. [R. 397-444, 473-97, 618-25.] In the treatment notes following the cystoscopy procedure that reflect the diagnosis of "fairly severe" cystitis, Ms. M was advised only to increase fluids, avoid certain foods and caffeine, and follow-up one month later. [R. 451.] A routine health exam with Ms. M's primary care provider one month after the cystoscopy involved no complaints of urinary issues and no urinalysis was required. [R. 488-92.] No opinion evidence in the record suggests that Ms. M's cystitis causes work-related limitations.

Ms. M points to a May 2016 progress note with her treating psychiatrist several days after her cystoscopy procedure. She reported that she experienced bladder stretching as a result of having to urinate every hour. [R. 460.] She claims that cystitis affects her ability to concentrate due to pain and requires access to a restroom on an urgent and frequent basis. [Pl.'s Mem. at 15.] The Court is not persuaded that this medical note undermines the legitimacy of the ALJ's step-two finding. Indeed, Ms. M's mental-health records generally showed that her thought process was normal and attention was fairly good. [R. 381-94, 606-17.] There is no evidence in the

record that the need to urinate every hour affected her ability to work part-time jobs, and by the

time of the hearing, she testified she was working 40 hours per week between two jobs.[4] [R. 54-

55.]

Ms. M asserts that interstitial cystitis, also known as "IC," is the subject of Social

Security Ruling 15-1p. This Ruling provides that "IC is a complex genitourinary disorder

involving recurring pain or discomfort in the bladder and pelvic region." SSR 15-1p, *Titles II &*

*Xvi: Evaluating Cases Involving Interstitial Cystitis (IC)*, 2015 WL 1292257, at *2 (S.S.A. Mar.

18, 2015). With respect to step two, the Ruling provides:

> If we find that a person with IC has an MDI [medically determinable impairment]
> that meets the duration requirement, and the person alleges pain and other
> symptoms consistent with IC, we must consider these symptoms in deciding
> whether the person's impairment is "severe" at step 2 of the sequential evaluation
> process, and at any later steps reached in the sequential evaluation process. If we
> find that the person's pain, urinary urgency or urinary frequency, or other
> symptoms have more than a minimal effect on a person's ability to perform basic
> work activities, we must find that the person has a "severe" impairment.

*Id.* at *8. Ms. M does not identify any way in which the ALJ's analysis was inconsistent with this

Ruling. The ALJ plainly complied with the requirement that IC be evaluated to determine

whether it was a severe impairment and that Ms. M's symptoms did not have more than a

---

[4] The Court notes that even impairments that are not considered severe must be taken into
account when evaluating a claimant's RFC. 20 C.F.R. § 416.945(a)(2) ("We will consider all of
your medically determinable impairments of which we are aware, including your medically
determinable impairments that are not 'severe' ... when we assess your residual functional
capacity."). Ms. M argues that the ALJ erred by failing to include any limitations related to
interstitial cystitis in the RFC, suggesting that it would need to account for absences, off-task
time, and the need for more frequent bathroom breaks. [Pl.'s Mem. at 17.] However, the ALJ
expressly rejected the inclusion of additional limitations in the RFC because "[t]he interstitial
cystitis that developed after the time of [the state agency consultants'] reviews also responded to
treatment and has not caused significant limitations for 12 months or more." [R. 32.] This finding
is supported by substantial evidence, including Ms. M's substantial work history and no
indication that she experienced such limitations that interfered with her ability to work.

minimal effect on her ability to perform basic work activities. Accordingly, the Court concludes that the ALJ did not commit any error with respect to SSR 15-1p in the step-two finding that interstitial cystitis did not qualify as a "severe impairment."

### C.  Vocational Expert Opinion

Ms. M next argues that the hypothetical question posed to the vocational expert ("VE") was based on a faulty RFC. She contends that the VE's opinion does not constitute substantial evidence concerning other jobs Ms. M could perform because the RFC assessment for simple, routine work and brief, superficial contact with others on an occasional basis "was not supported by any of the medical evidence or opinions in the file." [Pl.'s Mem. at 16.] Specifically, Ms. M asserts that the state agency consultants indicated that Ms. M could handle employment at a job that involved simple, 1-2 step, unskilled, routine, and repetitive entry-level work, and the ALJ erred by failing to adopt an RFC limitation of 1-2 step tasks. She claims that the ALJ should have only asked the VE about a hypothetical individual who was able to perform jobs with Specific Vocational Preparation ("SVP")[5] designation of 1, but that he erroneously concluded that Ms. M was able to do jobs with an SVP 2 designation. [*Id.*at 16-17.]

The ALJ asked the VE whether jobs exist in the national economy for a person with Ms. M's age, education, work experience, and the RFC discussed above. The VE identified the jobs of a "Housekeeping Cleaner," "Industrial Cleaner," and "Cleaner II" as positions that exist in substantial numbers in the national economy for someone with such characteristics. The first two of these jobs are designated with an SVP of 2, and the Cleaner II position has an SVP of 1. [R. 34.]

---

[5] SVP designations indicate how long a typical employee will take to learn how to perform a position. As plaintiff notes, "[a]n SVP 1 job requires only a short demonstration to learn the techniques of a position, whereas an SVP 2 job requires up to 1 month...." [Pl.'s Mem. at 16 n.7.]

For the following reasons, the Court is not persuaded that the ALJ erred with respect to this issue. First, although Ms. M argues the VE should only have considered the availability of jobs with an SVP of 1, the Cleaner II position has that very designation. Given that one of the jobs considered by the ALJ and the VE had the SVP 1 designation, Ms. M cannot show that the outcome would be different if the Court were to remand with instructions to only consider the availability of such positions. Second, the Court notes that Ms. M's job at McDonald's and the convenience store have an SVP of 2, which is consistent with the VE's testimony that she could perform the work required by the Housekeeping Cleaner and Industrial Cleaner positions that were considered.

And third, although the state agency consultants suggested Ms. M should be limited to simple, 1-2 step tasks, the ALJ limited Ms. M to "simple routine work, limited to brief and superficial contact with others on an occasional basis." [R. 25-33.] The ALJ was not required to base Ms. M's RFC precisely on a medical source opinion because the ALJ bases the RFC determination on the record as a whole. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) ("[A]n ALJ is not required to rely on a particular physician's opinion. … Rather, it is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians.") (cleaned up); *Peterson v. Colvin*, No. 13-0329-CV-W-ODS, 2013 WL 6237868, at *4 (W.D. Mo. Dec. 3, 2013) ("Plaintiff overstates the law by contending there must be medical evidence that precisely supports each component of the RFC."). Here, the ALJ gave significant weight to certain portions of the consultants' opinions, but observed that evidence from the period after the consultants offered their opinions showed improvement in Ms. M's functioning and by the time of the hearing, she was working increased hours at her fast-food and

convenience store jobs. Accordingly, the Court concludes that the Commissioner's decision need not be reversed based on the ALJ's reliance on the VE's testimony.

### D. Consideration of Ms. M's Self Reports

Finally, Ms. M asserts that the ALJ erred in relying on Ms. M's own reports regarding her ability to work a full-time, competitive job. [Pl.'s Mem. at 18-19.] If the ALJ had considered only Ms. M's own testimony about her desire and ability to work a full-time job, the Court would agree that such reliance would be problematic in a case like this one. However, the ALJ considered the evidence in the record as a whole, acknowledged issues with the reliability of Ms. M's self-reports regarding her mental condition, and discussed other evidence in the record that further supported Ms. M's ability to hold a full-time job. [*See, e.g.*, R. 21-22 (noting that Ms. M testified that she was working 40 hours a week between two jobs and "that she did not see a problem working 40 hours between the two jobs"); R. 29 (ALJ decision acknowledging Ms. M had some lack of insight regarding her mental condition); R. 259-70 (reports from Ms. M's mother regarding her ability to perform daily activities); R. 296 ("My mother feels I have the listening and verbal skills to be successful on a job"); R. 316 (stating that Ms. M "has the needed skills to live independently").] In this context, the Court concludes that the ALJ did not err in considering Ms. M's self-reports regarding her employability alongside evidence from other sources that supported the ALJ's conclusion that she is not disabled.

### IV. Recommendation

For the reasons discussed above, **IT IS HEREBY RECOMMENDED THAT:**

1. Ms. M's motion for summary judgment **[ECF No. 12]** be **DENIED**;

2. The Commissioner's motion for summary judgment **[ECF No. 14]** be **GRANTED**; and

3.  This matter be dismissed with prejudice.


Date: May 11, 2020                          *s/Katherine Menendez*
                                            Katherine Menendez
                                            United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.